FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

# Jul 29, 2021

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

DANIEL K.,[1]

        Plaintiff,

   v.

KILOLO KIJAKAZI, ACTING
COMMISSIONER OF SOCIAL
SECURITY,[2]

        Defendant.

No.    4:20-CV-05115-EFS

**ORDER GRANTING PLAINTIFF'S
SUMMARY-JUDGMENT MOTION
AND DENYING DEFENDANT'S
SUMMARY-JUDGMENT MOTION**

Plaintiff Daniel K. appeals the denial of benefits by the Administrative Law Judge (ALJ). He alleges the ALJ erred by 1) conducting an improper step-two analysis by failing to recognize certain severe impairments, 2) conducting an

---

[1] To protect the privacy of the social-security Plaintiff, the Court refers to him by first name and last initial or as "Plaintiff." *See* LCivR 5.2(c).

[2] On July 9, 2021, Ms. Kijakazi became the Acting Commissioner of Social Security. She is therefore substituted for Andrew Saul as Defendant. Fed. R. Civ. P. 25(d); 42 U.S.C. § 405(g).

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 1

inadequate step-three analysis and improperly determining his impairments did not meet or equal a listing, 3) improperly considering certain medical opinions, and 4) improperly determining step five based on an incomplete hypothetical question. In contrast, Defendant Commissioner of Social Security asks the Court to affirm the ALJ's decision. After reviewing the record and relevant authority, the Court grants Plaintiff's Motion for Summary Judgment, ECF No. 17, and denies the Commissioner's Motion for Summary Judgment, ECF No. 18.

## I.    Five-Step Disability Determination

A five-step sequential evaluation process is used to determine whether an adult claimant is disabled.[3] Step one assesses whether the claimant is currently engaged in substantial gainful activity.[4] If the claimant is engaged in substantial gainful activity, benefits are denied.[5] If not, the disability evaluation proceeds to step two.[6]

Step two assesses whether the claimant has a medically severe impairment or combination of impairments that significantly limit the claimant's physical or

---

[3] 20 C.F.R. § 404.1520(a).

[4] *Id.* § 404.1520(a)(4)(i).

[5] *Id.* § 404.1520(b).

[6] *Id.* § 404.1520(b).

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 2

mental ability to do basic work activities.[7] If the claimant does not, benefits are denied.[8] If the claimant does, the disability evaluation proceeds to step three.[9]

Step three compares the claimant's impairment or impairments to several recognized by the Commissioner as so severe as to preclude substantial gainful activity.[10] If an impairment or combination of impairments meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.[11] If not, the disability evaluation proceeds to step four.

Step four assesses whether an impairment prevents the claimant from performing work he performed in the past by determining the claimant's residual functional capacity (RFC).[12] If the claimant can perform past work, benefits are denied.[13] If the claimant cannot perform past work, the disability evaluation proceeds to step five.

Step five assesses whether the claimant can perform other substantial gainful work—work that exists in significant numbers in the national economy—

---

[7] 20 C.F.R. § 404.1520(a)(4)(ii).

[8] *Id.* § 404.1520(c).

[9] *Id.* § 404.1520(c).

[10] *Id.* § 404.1520(a)(4)(iii).

[11] *Id.* § 404.1520(d).

[12] *Id.* § 404.1520(a)(4)(iv).

[13] *Id.* § 404.1520(a)(4)(iv).

1

2

considering the claimant's RFC, age, education, and work experience.[14] If so, benefits are denied. If not, benefits are granted.[15]

The claimant has the initial burden of establishing he is entitled to disability benefits under steps one through four.[16] At step five, the burden shifts to the Commissioner to show the claimant is not entitled to benefits.[17]

If there is medical evidence of drug or alcohol addiction (DAA), the ALJ must then determine whether DAA is a material factor contributing to the disability.[18] To determine whether DAA is a material factor contributing to the disability, the ALJ evaluates which of the current physical and mental limitations would remain if the claimant stopped using drugs or alcohol and then determines whether any or all of the remaining limitations would be disabling.[19] Social Security claimants may not receive benefits if the remaining limitations without DAA would *not* be

---

[14] *Id.* § 404.1520(a)(4)(v); *Kail v. Heckler*, 722 F.2d 1496, 1497-98 (9th Cir. 1984).

[15] 20 C.F.R. § 404.1520(g).

[16] *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007).

[17] *Id.*

[18] 20 C.F.R. § 404.1535(a).

[19] *Id.* § 404.1535(b)(2).

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 4

disabling.[20] The claimant has the burden of showing that DAA is not a material contributing factor to disability.[21]

## II.    Factual and Procedural Summary

Plaintiff filed a Title II application, alleging a disability onset date of January 15, 2017.[22] His claim was denied initially and upon reconsideration.[23] An administrative hearing was held by video before Administrative Law Judge Lori L. Freund.[24]

When denying Plaintiff's disability claim, the ALJ found:

- Plaintiff met the insured status requirements through December 31, 2022.

- Step one: Plaintiff had not engaged in substantial gainful activity since January 15, 2017, the alleged onset date.

- Step two: Plaintiff had the following medically determinable severe impairments: degenerative disc disease of the cervical spine, obesity,

---

[20] 42 U.S.C. § 423(d)(2)(C); 20 C.F.R. § 404.1535; *Sousa v. Callahan*, 143 F.3d 1240, 1245 (9th Cir. 1998).

[21] *Parra*, 481 F.3d at 748.

[22] AR 255-63.

[23] AR 140-42, 144-46.

[24] AR 37-102.

cannabis use disorder, alcohol use disorder, major depressive disorder, and generalized anxiety disorder.[25]

- Step three: Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.

- RFC: Plaintiff had the RFC to:

  perform light work as defined in 20 CFR 404.1567(b) with the following additional limitations: the claimant can lift/carry 20 pounds occasionally and 10 pounds frequently. He can stand/walk for at least six hours in an eight-hour workday and sit for at least eight hours in an eight-hour workday. He should never climb ladders, ropes, or scaffolds, but can occasionally climb ramps and stairs. The claimant can occasionally balance, stoop, kneel, crouch, and crawl. He can frequently handle and finger bilaterally. He should avoid unprotected heights and hazardous machinery. The claimant can perform simple repetitive tasks away from the general public. He can have occasional interaction with coworkers and supervisors, but should not be required to work on tandem tasks. He can tolerate occasional changes in a work setting. The claimant should avoid any type of fast-paced production line work.[26]

- Step four: Plaintiff was not capable of performing past relevant work.[27]

- Step five: Prior to November 3, 2019, considering Plaintiff's RFC, age, education, and work experience, Plaintiff could perform work that

---

[25] AR 21.

[26] AR 22.

[27] AR 27.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 6

existed in significant numbers in the national economy, such as office helper, mail room clerk, and small parts assembler.[28] Beginning on November 3, 2019, the date Plaintiff's age category changed to an individual of advanced age, considering Plaintiff's RFC, age, education, and work experience, there are no jobs that exist in significant numbers in the national economy that Plaintiff could perform.[29] Plaintiff, therefore, was not disabled prior to November 3, 2019, but became disabled on that date and continued to be disabled through the date of the ALJ decision.[30]

- DAA: Plaintiff's substance use disorder was not a contributing factor material to the disability determination.[31]

When assessing the medical-opinion evidence:

- the ALJ found the following opinions persuasive: the reviewing opinion of medical expert Ronald Kendrick, M.D., the examining opinion of psychologist Susan Van, Ph.D., and the reviewing opinion of state agency psychologist Renee Eisenhauer, Ph.D.

---

[28] AR 29.

[29] AR 29.

[30] AR 29.

[31] AR 29.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 7

- the ALJ found portions of the following opinions persuasive and other portions not persuasive: state agency physician Guillermo Rubio, M.D., consultative examiner William Drenguis, M.D., treating physician Matt Smith, M.D., and consultative examiner Patrick Metoyer, Ph.D.

- the ALJ found not persuasive the reviewing opinion of medical expert Stephen Rubin, Ph.D., and the opinion of state evaluator N.K. Marks, Ph.D.

The ALJ also found Plaintiff's medically determinable impairments could reasonably be expected to cause some of his alleged symptoms, but his statements concerning the intensity, persistence, and limiting effects of those symptoms were not fully supported by the medical evidence and other evidence.[32]

Plaintiff requested review of the ALJ's decision by the Appeals Council, which denied review.[33] Plaintiff timely appealed to this Court.

### III.    Standard of Review

A district court's review of the Commissioner's final decision is limited.[34] The Commissioner's decision is set aside "only if it is not supported by substantial

---

[32] AR 23.

[33] AR 1-6.

[34] 42 U.S.C. § 405(g).

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 8

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

evidence or is based on legal error."[35] Substantial evidence is "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[36] Moreover, because it is the role of the ALJ and not the Court to weigh conflicting evidence, the Court upholds the ALJ's findings "if they are supported by inferences reasonably drawn from the record."[37] The Court considers the entire record.[38]

Further, the Court may not reverse an ALJ decision due to a harmless error.[39] An error is harmless "where it is inconsequential to the ultimate

---

[35] *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012).

[36] *Id.* at 1159 (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)).

[37] *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

[38] *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (The court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion," not simply the evidence cited by the ALJ or the parties.) (cleaned up); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered[.]").

[39] *Molina*, 674 F.3d at 1111.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 9

nondisability determination."[40] The party appealing the ALJ's decision generally bears the burden of establishing harm.[41]

## IV.    Analysis

**A.    Step Two (Severe Impairment): Plaintiff fails to establish consequential error.**

Plaintiff contends the ALJ erred at step two by failing to identify the following as severe impairments: "(1) cervical radiculopathy and left ulnar neuropathy, with severe left C8/T1 chronic radiculopathy, decreased left hand strength, severe muscle atrophy of left 1stDorInt, very weak interossei in the left ulnar nerve distribution, wasting of the hypothenar eminence, and decreased sensation in a C8 distribution" and "(2) right median nerve axonal loss, severe muscle atrophy of right great thenars, and right hand weakness and numbness secondary to a stab wound in his right forearm, with decreased sensation in a median nerve distribution, wasting of the thenar musculature, decreased grip strength, and a poor prognosis."[42]

At step two of the sequential process, the ALJ must determine whether the claimant suffers from a "severe" impairment, i.e., one that significantly limits his

---

[40] *Id.* at 1115 (cleaned up).

[41] *Shinseki v. Sanders*, 556 U.S. 396, 409-10 (2009).

[42] ECF No. 17 at 16-17.

physical or mental ability to do basic work activities.[43] This involves a two-step process: 1) determining whether a claimant has a medically determinable impairment and 2), if so, determining whether that impairment is severe.[44]

Neither a claimant's statement of symptoms, nor a diagnosis, nor a medical opinion sufficiently establishes the existence of an impairment.[45] Rather, impairments "must be established by medical evidence consisting of signs, symptoms, and laboratory findings."[46] If the objective medical signs, symptoms, and laboratory findings demonstrate the claimant has a medically determinable impairment, then the ALJ must determine whether that impairment is severe.[47] A medically determinable impairment is not severe if the "medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work."[48] Likewise, an impairment is not severe if it does not significantly limit a claimant's physical or mental ability to do basic work activities, which include the following: walking, standing, sitting, lifting, pushing, pulling, reaching, carrying,

---

[43] 20 C.F.R. § 404.1520(c).

[44] *Id.* § 404.1520(a)(4)(ii).

[45] *Id.* § 404.908.

[46] 20 C.F.R. § 404.908.

[47] *See* Social Security Ruling (SSR) 85-28 at *3.

[48] *Id.*

or handling; seeing, hearing, and speaking; understanding, carrying out and remembering simple instructions; responding appropriately to supervision, coworkers and usual work situations; and dealing with changes in a routine work setting.[49]

Step two is "a de minimus screening device [used] to dispose of groundless claims."[50] For that reason, "[g]reat care should be exercised in applying the not severe impairment concept."[51] Notably, however, step two "is not meant to identify the impairments that should be taken into account when determining the RFC" as step two is meant *only* to screen out weak claims, whereas the crafted RFC must take into account all impairments, both severe and non-severe.[52]

Here, the ALJ found Plaintiff had the severe impairments of degenerative disc disease of the cervical spine, obesity, cannabis use disorder, alcohol use disorder, major depressive disorder, and generalized anxiety disorder.[53] The ALJ found the recent diagnosis of bipolar disorder was not a separate medically determinable severe impairment because "any symptoms are subsumed into the

---

[49] 20 C.F.R. § 404.921(a) (2010); SSR 85-28.

[50] *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996).

[51] SSR 85-28.

[52] *Buck v. Berryhill*, 869 F.3d 1040, 1048–49 (9th Cir. 2017).

[53] AR 21.

depressive and anxiety disorders, regardless of the specific diagnosis."[54] Plaintiff does not challenge this finding. Plaintiff does, however, challenge the ALJ's failure to find that cervical radiculopathy, left ulnar neuropathy, right median nerve axonal loss, and related numbness, atrophy, loss of strength, decreased sensation, grip strength and other issues were not medically determinable severe impairments. Plaintiff states that "[t]he medical records and opinions are more than enough to meet the *de minimus* step two screening designed to screen out groundless claims."[55] Medical opinions are not considered when determining whether a medically determinable impairment exists.[56] Nonetheless, Plaintiff cites to medical evidence in the record including:

- A 2016 treatment note from Jean You, M.D., noting that "On exam, severe muscle atrophies of left 1stDorInt, and right great thenars; impaired light tough sensation on left ulnar and right medium nerve distributions of both hands; all provocative tests were unremarkable."

- Physical evaluation notes from Dr. Drenguis noting that "sensory exam shows decreased sensation to pinprick and light touch. In the right hand, it is in a median nerve distribution. In the left hand, it is

---

[54] AR 21.

[55] ECF 17 at 17.

[56] 20 C.F.R. § 404.1521 ("We will not use your statement of symptoms, a diagnosis, or a medical opinion to establish the existence of an impairment(s).").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

the little finger and entire ring figure, which is a C8 distribution."[57]
Under "Diagnosis and Prognosis," Dr. Drenguis wrote, and Plaintiff
notes, "Right hand weakness and numbness: This problem is
secondary to a stab wound in his right forearm, as a teen, with an
attempted nerve repair. On today's examination, there is decreased
sensation in a median nerve distribution; there is wasting of the
thenar musculature and decreased grip strength. Prognosis is poor."

When an ALJ resolves step two in a claimant's favor by finding a medically
determinable severe impairment, any error in failing to find other severe
impairments is harmless at step two; however, step-two error can be prejudicial at
a later step in the sequential disability analysis.[58]

Plaintiff argues the failure to consider these alleged upper bilateral
impairments at step two was harmful later in the disability analysis because the
ALJ failed to include manipulative limitations in Plaintiff's RFC. However, the
ALJ did consider Plaintiff's alleged manipulative limitations and simply rejected

---

[57] AR 1042.

[58] *See Stout v. Comm'r of Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006);
*Burch v. Barnhart*, 400 F.3d 676, 682 (9th Cir. 2005) ("Assuming without deciding
that this omission constituted legal error [at step two], it could only have
prejudiced Burch in step three (listing impairment determination) or step five
(RFC) because the other steps, including this one, were resolved in her favor.").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

that Plaintiff was as limited as alleged. Plaintiff claims he should have been restricted to only occasional handling and fingering, but the ALJ concluded Plaintiff could perform frequent handling and fingering. The ALJ acknowledged Plaintiff's severe left C8/T1 chronic radiculopathy, decreased sensation in the ulnar nerve distribution, atrophy in the left first dorsal interossei, slightly diminished grip strength, and marked difficulty manipulating a button with both hands, but cited other record evidence to conclude Plaintiff could frequently handle and finger bilaterally, including that Plaintiff had intact motor strength and sensation, could pick up a coin and turn a doorknob with either hand, could manipulate a button using both hands simultaneously (although not individually), and could tie a bow with both hands simultaneously.[59] The ALJ's citation to the record evidence demonstrates that, when crafting the RFC, the ALJ considered Plaintiff's upper bilateral limitations even though the ALJ did not assess any upper bilateral severe impairment at step two. For that reason, and because the ALJ resolved step two in Plaintiff's favor, any error in failing to discuss or find an upper bilateral severe impairment was harmless at step two. Because the case must be remanded and the disability analysis must be conducted anew as explained below, the Court need not determine whether any step-two error was consequential at a later step in the disability analysis.

_____

[59] AR 23.

**B.      Step Three (Listings): Plaintiff establishes consequential error.**

Plaintiff contends the ALJ erred at step three by 1) failing to properly evaluate the mental health record by citing just three pages out of hundreds, 2) failing to consider Listing 1.02B, and 3) failing to acknowledge the severity of Plaintiff's muscle atrophy and cervical impairments in relation to Listing 1.04. Plaintiff argues that, when the record is properly evaluated, he meets or equals Listing 12.04 and 12.06, singly or in combination, and remand is required to determine whether he meets listing 1.02B or 1.04A.

At step three, the ALJ must determine if a claimant's impairments meet or equal a listed impairment.[60] To meet a listed impairment, the claimant has the burden of establishing that he meets each characteristic of a listed impairment.[61] The ALJ must support her listings finding with more than a boilerplate finding that a listing was not satisfied. The ALJ must articulate the reasons why the claimant does not satisfy the listing requirements; however, the ALJ's supporting findings may be articulated at a different step in the sequential evaluation process.[62]

---

[60] 20 C.F.R. § 404.1520(a)(4)(iii).

[61] *Id.* § 404.1525(d); *Burch*, 400 F.3d at 683.

[62] SSR 17-2p, 2017 WL 3928306, at *4; *see also Lewis v. Apfel*, 236 F.3d 503, 512 (9th Cir. 2001); *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200-01 (9th Cir. 1990); *see also Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981) (requiring the

Here, this Court need not evaluate the requirements for the listings Plaintiff claims he meets as the Court agrees the step-three analysis was tainted by the ALJ's failure to consider the complete mental health record. Plaintiff is correct that, at step three, the ALJ cited very few pages out of a much larger mental-health record. Generally, however, the failure to cite evidence is not a sufficient indication that the ALJ failed to consider it.[63] In other words, an ALJ may have considered evidence in the record even though the ALJ does not cite that evidence in her decision. Here, however, as explained below, the Court is confident that certain evidence related to Plaintiff's bipolar diagnosis was overlooked or ignored.

At step two, the ALJ failed to recognize bipolar disorder as a severe mental impairment, saying any symptoms of Plaintiff's bipolar disorder were "subsumed into the depressive and anxiety disorders, regardless of the specific diagnosis."[64] While this was not error at step two, as discussed above, the ALJ was wrong to conclude Plaintiff's bipolar symptoms were the same as his depression and anxiety symptoms. Plaintiff's bipolar symptomology differed in significant ways from the symptoms of his depression and anxiety, as explained below. By stating that

---

"subordinate factual foundations on which the [ALJ's] ultimate factual conclusions" were based, to be explained).

[63] *Black*, 143 F.3d at 386 ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered[.]").

[64] AR 21.

1

2

3

Plaintiff's bipolar symptoms were accounted for by his depression and anxiety, it is clear the ALJ failed to recognize and consider certain relevant symptoms that could impact the disability analysis.

4

5

6

7

8

9

10

11

12

13

14

15

16

The record in this case documents that Plaintiff experienced the following symptoms related to his bipolar diagnosis: mania, paranoia, sensation-seeking behavior, racing thoughts, flight of ideas, grandiosity, days without sleep, and delusional thinking. For example, during one manic episode in February 2017, Plaintiff was driving and called his treating psychologist, Dr. Kusch,[65] stating that he had "free reign of the town," he had urinated in front of a police officer, and he was taking down the license plate numbers of "the people who [we]re following him."[66] Dr. Kusch told Plaintiff he was exhibiting paranoid and manic behavior and acting recklessly and he should immediately go to the emergency department (which Plaintiff declined to do).[67] Plaintiff also believed his phone and computer had been hacked and he spent hours talking to the police and computer repair services, even calling Washington D.C., and eventually purchased a new computer

17

18

19

20

[65] Dr. Kusch is a clinical psychologist not mentioned by the ALJ who conducted at least seven therapy sessions with Plaintiff as part of an employee assistance program. *See* AR 919 (treatment note from Dr. Kusch stating it was Plaintiff's seventh EAP counseling session).

21

[66] AR 873.

22

[67] AR 873.

23

and phone.[68] Dr. Kusch noted that his belief about the computer hacking was a paranoid symptom that should be monitored.[69] Plaintiff obsessed for some time about the computer hacking and his belief that he was being followed.[70]

Even physical treatment providers at this time noted Plaintiff's paranoid and manic state. In February 2017, Plaintiff was seen at an urgent care clinic for a burn injury where the treating provider noted his "[t]hought content [wa]s paranoid."[71] A month later in March 2017, Plaintiff's primary physician, Dr. Smith, noted at an appointment that Plaintiff seemed "hyper" and "manic," stating that "He is energetic, moving in quick bursts" and that he had lost 17 pounds.[72]

In a progress report from Dr. Kusch from March 20, 2017, Plaintiff reported what Dr. Kusch referred to as sensation-seeking behavior, including following a truck he believed was out stealing cars and writing messages in chalk in front of homes that he believed were "tweeking."[73] This behavior was corroborated by Plaintiff's then-wife who called Dr. Smith's office in April 2017 and reported that

---

[68] AR 873, 875.

[69] AR 875.

[70] AR 913 ("[Plaintiff]" continues to perseverate on his computer being hacked and his beliefs reflect a conspiracy theory.").

[71] AR 887.

[72] AR 972.

[73] AR 919.

Plaintiff, among other unusual behavior, had been writing religious statements on the sidewalk, in front of their house, and on his T-shirts.[74] Apparently the neighbors complained about Plaintiff's actions, which led to an encounter with the police in February 2017, after which Plaintiff was arrested and spent the weekend in jail.[75] Plaintiff was again arrested in April 2017—in that instance, Plaintiff apparently thought he was being followed by homeless individuals and videotaped the individuals and brought the tapes to police, asking them to take action.[76] Instead, Plaintiff was arrested because the police said he had brandished a gun.[77]

In an October 2017 treatment note from Dr. Cagle, a physician not mentioned by the ALJ but who treated Plaintiff during an approximately 20-day inpatient stay, it was noted that Plaintiff "reluctantly admit[ted] to both mania and depression" and disclosed that mania was a respite from persistent dysphoria.[78] Plaintiff reported to Dr. Cagle that mania does not happen enough for him as, when he is manic, he feels better, he finishes other people's sentences, he is too

---

[74] AR 808.

[75] AR 923.

[76] AR 728.

[77] AR 728.

[78] AR 736.

confident, more assertive, and pushy.[79] He further said that when he is manic he is more energetic, loses weight, is more productive, and thinks faster.[80]

When Dr. Cagle discussed the February 2017 episode with Plaintiff (in which Plaintiff called Dr. Kusch and reported taking down license plates of individuals following him), Plaintiff again insisted that rigs with blacked out windows were following him and taking pictures of him.[81] The October 2017 treatment note also provides that Plaintiff impulsively leased a Corvette and drove at excessive speeds, felt like he had special powers and no one could catch him, and that he would go on offense and chase people because he felt they were following him and recording him.[82]

In a "fitness-for-duty" evaluation from March 2017 performed by psychologist Dr. Susan Vann, whom the ALJ "agreed" with on certain matters, Dr. Vann noted that Plaintiff's results on the Millon Clinical Multiaxial Inventory (Third Edition), an objective personality measurement, showed that Plaintiff "is an energetic, impulsive individual who may experience significant problems with manic episodes, mental disorganization, and accelerated thought processes."[83]

---

[79] AR 722.

[80] AR 722.

[81] AR 737.

[82] AR 737.

[83] AR 923-24.

Plaintiff also reported significant sleep issues. To his primary physician, Dr. Smith, he reported that he usually does not sleep for a few days and then he crashes and sleeps soundly for a night.[84] This was corroborated by Plaintiff's then-wife, who told Dr. Smith's office that Plaintiff would get medication for depression and go on a "high" and then crash.[85] Dr. Smith was concerned that antidepressants were causing Plaintiff to experience mania (mania has been linked to the use of antidepressants in certain bipolar individuals[86]).

Dr. Vann and Dr. Smith were just two of multiple providers who diagnosed Plaintiff with bipolar disorder.[87] Dr. Cagle, who treated Plaintiff, also diagnosed him as bipolar and even began a course of lithium during Plaintiff's inpatient stay because he expected a "future manic episode" if Plaintiff's condition was not appropriately treated.[88] Dr. Marks, who evaluated Plaintiff, said that even on his medication, Plaintiff presented with "significant symptomology" for bipolar

---

[84] AR 1066.

[85] AR 808.

[86] *See, e.g.*, Gitlin, M.J, *Antidepressants in Bipolar Depression: An Enduring Controversy*, INT. J. BIPOLAR DISORDERS (Dec. 01, 2018), https://doi.org/10.1186/s40345-018-0133-9.

[87] AR 924 (Dr. Vann), AR 973, 1067 (Dr. Smith).

[88] AR 763. Dr. Smith also thought that Plaintiff "may need mood leveling medication." AR 806.

disorder.[89] In an October 2018 treatment note, another one of Plaintiff's treating providers, Dr. Brown, wrote that Plaintiff's "[p]sychiatric history is significant for bipolar disorder."[90]

In short, the record in this case documents that Plaintiff experienced mania, paranoia, delusional thinking, sensation-seeking behavior, racing thoughts, flight of ideas, grandiosity, and days without sleep. These are symptoms the providers related to Plaintiff's bipolar diagnosis, not his depression and anxiety. It is not clear, however, that the ALJ considered these symptoms during the five-step disability evaluation. Indeed, by stating that any bipolar symptoms were "subsumed into the depressive and anxiety disorders,"[91] it seems clear the ALJ overlooked the above symptoms. Nowhere in the ALJ opinion does the ALJ discuss mania, paranoia, or delusional thinking. Because these symptoms could impact the disability analysis, they should have been considered. Equating Plaintiff's bipolar symptoms with the symptoms of his depression and anxiety was error.

To be sure, the ALJ correctly noted that Plaintiff has a significant alcohol and substance abuse history, and some of his providers have stated that it is difficult to discern what mental symptoms are the result of mental illness as

[89] AR 1280.

[90] AR 1267.

[91] AR 21.

compared to substance abuse.[92] But the ALJ failed to note that at least one of

Plaintiff's treating providers also noted that Plaintiff was self-medicating for his

bipolar disorder. Dr. Smith, Plaintiff's primary care provider, wrote to Dr. Kusch

that:

> I think it is clear that he is bipolar, though he resists being labeled
> with that diagnosis, preferring "anxiety" as his primary problem. He
> exhibits flights of ideas, racing thoughts, irritability. I have records
> referring to mental health problems that began at least as far back as
> 2004. He has seen a psychiatrist who felt that he was likely bipolar
> and who tried a number of anti-psychotics including risperidone
> (didn't work), olanzapine (weight gain) and for a while he did fairly
> well with a combination of depakote and Seroquel. … Like many of
> those with bipolar disorder he self medicates with drugs and alcohol.[93]

Dr. Vann echoed that sentiment, stating that Plaintiff was "[p]ositive for a

history of psychiatric concerns including depression, anxiety, and bipolar disorder

likely self-medicated with alcohol, illegal substances, and prescription

substances."[94] Plaintiff's situation, therefore, might present a "chicken and egg"

causality dilemma—i.e., did Plaintiff's mental health issues cause him to self-

medicate with drugs and alcohol, or has Plaintiff's alcohol and substance abuse

---

[92] *See*, *e.g.*, AR 854 (Dr. Kusch noted that Plaintiff's substance abuse and alcohol

abuse, in combination with the stress of his failing marriage, led to the manic

episode which was "earmarked by significant paranoia, impulsivity, hyperactivity,

grandiosity, and delusional thinking.").

[93] AR 973.

[94] AR 923.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

caused what appear to be mental health symptoms? Such a dilemma, however, does not permit an ALJ to ignore relevant evidence in the record without explanation. The ALJ's failure to consider the symptoms noted above was error requiring remand for reconsideration. On remand, the ALJ should consider all relevant symptoms throughout the disability analysis, including at step three in determining whether Plaintiff meets or equals Listings 12.04 and 12.06, singly or in combination. If the ALJ again finds that certain bipolar symptoms are subsumed into the diagnoses of depression and anxiety, the ALJ should specifically articulate what those symptoms are. Further, if the ALJ rejects certain symptoms as the product of alcohol and substance abuse rather than bipolar disorder or another mental illness, the ALJ must meaningfully explain that decision with citations to the record. The ALJ shall further develop the record if such development is necessary.

As for Plaintiff's argument that the ALJ failed to consider Listing 1.02B (major dysfunction of a joint), Plaintiff has not established error. That listing consists of:

> [a] gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s) [in conjunction with] [i]nvolvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand),

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

> **resulting in inability to perform fine and gross movements effectively**, as defined in 1.00B2c.[95]

Plaintiff has the burden to show he meets every element of this listing.[96] Plaintiff claims the ALJ did not so much as consider the listing, but Plaintiff fails to offer this Court a theory about how he could meet this listing even though the medical evidence established that Plaintiff could pick up a coin and turn a doorknob with either hand, could manipulate a button using both hands simultaneously, and could tie a bow with both hands simultaneously. Because Plaintiff has not explained how he is unable to perform fine and gross movements effectively, he has not established error.[97] Likewise, Plaintiff has not explained to this Court how he meets Listing 1.04A. In any case, Plaintiff's motion for summary judgment states that he seeks only remand for reevaluation of whether he meets

---

[95] 20 C.F.R. Part 404, Subpart P, Appendix 1, 1.02B (emphasis added).

[96] *Id.* § 404.1525(d); *Burch*, 400 F.3d at 683.

[97] Plaintiff—not the Court—must flesh out and support his arguments with law and facts. *See Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 930 (9th Cir. 2003) ("We require contentions to be accompanied by reasons."); *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to . . . put flesh on its bones.").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Listings 1.02B and/or 1.04A. This Court has ordered remand for a new sequential

analysis beginning at step two, as explained above.

**C.    Medical Opinions: The ALJ must reevaluate.**

Plaintiff challenges the ALJ's conclusion that medical opinions from the

following providers were not persuasive: examining physician Dr. William

Drenguis, examining psychologist Dr. N.K. Marks, examining psychologist

Dr. Patrick Metoyer, and testifying medical expert psychologist Dr. Stephen Rubin.

As discussed below, the ALJ failed to meaningfully articulate the supportability

and consistency of these medical opinions.

1.    <u>Standard for claims filed on or after March 27, 2017</u>[98]

An ALJ must consider and evaluate the persuasiveness of all medical

opinions or prior administrative medical findings.[99] The ALJ will not, however,

"give any specific evidentiary weight . . . to any medical opinion(s)."[100]  A medical

opinion is a statement from a medical source about what the claimant can still do

---

[98] For claims filed on or after March 27, 2017, such as Plaintiff's claims, new

regulations apply that change the framework for how an ALJ must evaluate

medical opinion evidence. Revisions to Rules, 2017 WL 168819, 82 Fed. Reg. 5844

(Jan. 18, 2017); 20 C.F.R. § 404.1520c.

[99] 20 C.F.R. § 404.1520c(a), (b).

[100] Revisions to Rules, 2017 WL 168819, 82 Fed. Reg. at 5867-68; *see* 20 C.F.R.

§ 404.1520c(a).

despite her impairments and whether the claimant has one or more impairment-related limitations in the following abilities:

- performing physical demands of work activities

- performing mental demands of work activities (such as understanding, remembering, carrying out instructions, maintaining concentration, persistence, or pace, and responding appropriately to supervision, co-workers, or work pressures in a work setting)

- performing sensory demands of work

- adapting to environmental conditions.[101]

The factors for evaluating the persuasiveness of medical opinions and prior administrative medical findings include, but are not limited to, supportability, consistency, relationship with the claimant, and specialization.[102] Supportability

---

[101] 20 C.F.R. § 404.1513(a).

[102] *Id.* § 404.1520c(c)(1)-(5). When assessing the medical source's relationship with the claimant, the ALJ is to consider the treatment length, frequency, purpose, and extent, and whether an examination was conducted. *Id.* § 404.1520c(c)(3). The ALJ may also consider whether the medical source has familiarity with the other record evidence or an understanding of the disability program's policies and evidentiary requirements. *Id.* § 404.1520c(c)(5).

and consistency are the most important factors, and the ALJ is required to explain

how both factors were considered:[103]

> (1) Supportability. The more relevant the objective medical evidence
> and supporting explanations presented by a medical source are to
> support his or her medical opinion(s) or prior administrative medical
> finding(s), the more persuasive the medical opinions or prior
> administrative medical finding(s) will be.
>
> (2) Consistency. The more consistent a medical opinion(s) or prior
> administrative medical finding(s) is with the evidence from other
> medical sources and nonmedical sources in the claim, the more
> persuasive the medical opinion(s) or prior administrative medical
> finding(s) will be.[104]

Typically, the ALJ may, but is not required to, explain how the other factors were

considered.[105]

    2.    <u>Dr. William Drenguis</u>

    Dr. Drenguis performed a physical evaluation of Plaintiff on May 29,

2018.[106]  Dr. Drenguis diagnosed Plaintiff with cervical spondylosis, lumbar

---

[103] *Id.* § 404.1520c(b)(2).

[104] *Id.* § 404.1520c(c)(1)-(2).

[105] *Id.* § 404.1520c(b)(2). When two or more medical opinions or prior
administrative findings "about the same issue are both equally well-supported . . .
and consistent with the record . . . but are not exactly the same," the ALJ is
required to explain how "the other most persuasive factors in paragraphs (c)(3)
through (c)(5)" were considered. *Id.* § 404.1520c(b)(3).

[106] AR 1039-44.

tenderness, and right-hand weakness and numbness, and included additional

explanation:

**DIAGNOSIS AND PROGNOSIS:**

1. Cervical spondylosis: Recent cervical MRI shows marked degenerative changes with marked stenosis of the neural foramina; right side is more affected than the left. On today's examination, there is tenderness with muscle spasm and decreased range of motion of the cervical spine. Left hand shows decreased strength, wasting of the hypo-thenar eminence and decreased sensation in a C8 distribution. Prognosis is poor.

2. Lumbar tenderness: On today's examination, there is tenderness with muscle spasm and decreased range of motion. There are no sciatic or radicular findings. Previous x-rays are reported to show degenerative changes. Prognosis is fair.

3. Right hand weakness and numbness: This problem is secondary to a stab wound in his right forearm, as a teen, with an attempted nerve repair. On today's examination, there is decreased sensation in a median nerve distribution; there is wasting of the thenar musculature and decreased grip strength. Prognosis is poor.

Dr. Drenguis opined that Plaintiff could:

- sit for up to 4 hours at time.

- stand for up to 4 hours at a time.

- lift and carry 20 pounds occasionally and 10 pounds frequently.

- occasionally climb, balance, stoop, kneel, crouch, and crawl.

- frequently reach and occasionally handle, finger, and feel.[107]

The ALJ found Dr. Drenguis's opinion regarding Plaintiff's sitting, standing,

and manipulative limitations "not persuasive" because "there is no evidence to

support that the claimant should be limited to standing/walking and sitting for

four hours in an eight-hour workday" and "[t]he limitation to only occasional

---

[107] AR 1043.

handling, fingering, and feeling is also without support from the record, as there was only a mild degree of atrophy and mildly decreased grip strength."[108]

This Court is limited to reviewing the reasons provided by the ALJ and may not affirm the ALJ on a ground upon which she did not rely.[109] Here, the ALJ summarily concluded that "no evidence" supported Dr. Drenguis's opined sitting and standing limitations. But Dr. Drenguis specifically explained the basis for these limitations, stating that Plaintiff was "limited by the degenerative changes of his lumbar and cervical spine."[110] This functional assessment followed Dr. Drenguis's diagnosis of cervical spondylosis following a recent MRI that showed "marked degenerative changes with marked stenosis [abnormal narrowing] of the neural foramina."[111] And Dr. Drenguis's examination revealed tenderness, muscle spasm, and decreased range of motion.[112] He rated the prognosis of Plaintiff's cervical spondylosis condition as "poor."[113] On their face, these objective findings appear to support Dr. Drenguis's opined limitation regarding Plaintiff's ability to sit and stand for only four hours at a time. The ALJ, however, failed to address or

---

[108] AR 26.

[109] *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014).

[110] AR 1043.

[111] AR 1043.

[112] AR 1043.

[113] AR 1043.

discuss these medical findings, instead simply concluding that "no evidence" supported Dr. Drenguis's sitting and standing limitations. This was error. Such a perfunctory conclusion is not a meaningful discussion of the opined limitations and the evidence that does or does not support them. It is well-settled that an ALJ should not substitute her own judgment for that of a medical expert.[114] Without a meaningful explanation from the ALJ as to *why* "no evidence" supported the limitations despite Dr. Drenguis's findings (tenderness, muscle spasm, and decreased range of motion) and the other record evidence—including MRIs that showed slight disc bulging, arthropathy, foraminal narrowing, anterior osteophytic spurring (bone spurs), irritation of the C8 nerve root, and more[115]—this Court is left to conclude the ALJ substituted her judgment in place of Dr. Drenguis's. While the crafted RFC aligned with the reviewing opinion of Dr. Ronald Kendrick, which

---

[114] *See Williams v. Comm'r of Soc. Sec. Admin.*, 494 F. App'x 766, 769 (9th Cir. 2012) (unpublished); *see also Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir.1998) ("'[T]he ALJ cannot arbitrarily substitute his own judgment for competent medical opinion[.]'" (citations omitted)); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir.1996) (ALJ "must not succumb to the temptation to play doctor and make [his] own independent medical findings."); *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir.1985) (ALJ may not substitute his interpretation of laboratory reports for that of physician).

[115] *See, e.g.*, AR 460, 474, 849.

the ALJ may have thought to be more appropriate, the ALJ still was required to meaningfully explain that decision by explaining the supportability and consistency of Dr. Drenguis's opinion. The bare conclusory statement that "no evidence" supported the opined sitting or standing limitations is not sufficient on this record--a record that contains evidence of serious spinal issues.

Because the ALJ did not explain why Dr. Drenguis's opined sit and stand limitations were less supported and less consistent than Dr. Kendrick's, this Court cannot meaningfully review the ALJ's decision to restrict Plaintiff to 6 hours of standing and 8 hours of sitting rather than 4 hours of each. Without the ability to meaningfully review the decision, this Court will not assume any error was harmless. On remand, the ALJ should properly consider the persuasiveness of Dr. Drenguis's opined sit and stand limitations.

As for Dr. Drenguis's opined limitation that Plaintiff could only occasionally handle, finger, and feel, Dr. Drenguis assessed the limitation noting that "Plaintiff is limited by the right median nerve injury to his hand and left C8 radiculopathy."[116] The ALJ, however, rejected the limitation in favor of a restriction to frequent handling, fingering, and feeling, stating that a restriction to only occasional activity was "without support from the record, as there was only a mild degree of atrophy and mildly decreased grip strength."[117] This explanation,

---

[116] AR 1043.

[117] AR 26.

albeit terse, allows this Court to discern the ALJ's conclusions regarding the supportability of Dr. Drenguis's manipulative limitation—the ALJ concluded the most relevant evidence was evidence of grip strength, and that evidence supported a frequent limitation rather than a more restrictive occasional limitation. But that explanation does not address the consistency of the opinion as the ALJ did not explain why Dr. Drenguis's opinion was inconsistent with evidence from other medical sources or why an occasional limitation was more consistent with the other evidence. On remand, the ALJ must address both the supportability and the consistency of Dr. Drenguis's opinion.

3.    Dr. N.K. Marks

Dr. Marks performed a psychological evaluation of Plaintiff on February 2, 2018.[118] Dr. Marks diagnosed Plaintiff with the following: persistent depressive disorder, noting that Plaintiff presented with significant symptomology for bipolar II, which should be ruled out; major depressive disorder; generalized anxiety disorder; and substance use disorder in apparent remission.[119] Dr. Marks assessed "marked" limitations in the following categories:

- perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances without special supervision.

---

[118] AR 1039-44.

[119] AR 1280.

- communicate and perform effectively in a work setting.

- maintain appropriate behavior in a work setting.

- complete a normal workday and work week without interruptions from psychologically based symptoms.

- set realistic goals and plan independently.[120]

The ALJ rejected Dr. Marks's opinion as not persuasive, stating that "No other evaluator found as many marked limitations as Dr. Marks and it appears that she relied heavily upon the claimant's self-reported symptoms, which, as discussed above, have not been very consistent and were often motivated by drug-seeking behavior."[121]

Thus, as for consistency, the ALJ determined Dr. Marks's opinion was an outlier and was more restrictive than any other medical provider. As a factual matter, the ALJ is incorrect. Dr. Renee Eisenhauer, whom the ALJ found persuasive, assessed identical "marked" limitations.[122] The ALJ ignored or overlooked this fact, however, and noted only the part of Dr. Eisenhauer's opinion regarding the basic work activities for which Plaintiff had no significant limitation. Because the ALJ found Dr. Eisenhauer's opinion persuasive, and because Dr. Eisenhauer assessed the same marked limitations as Dr. Marks, the ALJ could

---

[120] AR 1281.

[121] AR 27.

[122] AR 1276.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

not validly reject Dr. Marks's opinion as an inconsistent outlier opinion. And, in any case, the consistency inquiry is not simply a comparison of the opinions given by medical sources. It is a comparison of the medical opinion in question to "*evidence* from other medical sources and nonmedical sources."[123] The question, then, is whether the opinion is consistent with the medical evidence from other sources, not simply the other opinions in the record, although those are certainly relevant to the extent they are supported by the medical evidence. On remand, the ALJ should reevaluate the consistency of Dr. Marks's opinion.

As for supportability, the ALJ found Dr. Marks's opinion was called into question because it appeared to rely heavily on Plaintiff's self-reports, which the ALJ said were inconsistent and often motivated by drug-seeking behavior.[124] Plaintiff is correct that, with respect to mental symptoms, an ALJ may not discount those symptoms simply because they are "self-reports," as such is the nature of psychiatry and psychology.[125] Here, however, the ALJ said more—she said Plaintiff's self-reports were inconsistent and motivated by drug-seeking behavior. These are valid grounds to find that self-reported symptoms, which might otherwise support the assessed mental limitations, are not sufficiently

---

[123] 20 C.F.R. § 404.1520c(c)(1) (emphasis added).

[124] AR 27.

[125] *Buck*, 869 F.3d at 1049.

relevant evidence in support of the limitations. Of course, the record evidence must support these conclusions.

Elsewhere in the opinion, the ALJ outlines Plaintiff's past drug-seeking behavior,[126] but nowhere does the ALJ discuss inconsistent symptom reporting. Instead, the ALJ noted general inconsistencies—the number of medications Plaintiff claimed to be taking and whether Plaintiff had stopped working, for example.[127] The ALJ did not cite inconsistencies in symptom reporting, however. On remand, if the ALJ again relies on Plaintiff's inconsistent symptom reporting, the ALJ should provide specific citations to record evidence demonstrating that inconsistency.

4.    Dr. Patrick Metoyer

Dr. Metoyer performed a mental evaluation of Plaintiff on May 20, 2018.[128] Dr. Metoyer diagnosed Plaintiff with the following: generalized anxiety disorder; bipolar I disorder, current depressive episode; and PTSD (by history). Dr. Metoyer provided the following functional assessment:

---

[126] *See* AR 24.

[127] *See* AR 25.

[128] AR 1033-37.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**FUNCTIONAL ASSESSMENT:** Claimant appears to have the ability to reason and understand. He does have some adaptation skills. Remote memory is intact. Recent and immediate memory are mildly impaired. Sustained concentration and persistence are adequate based on brief concentration tasks of this evaluation. The claimant does describe difficulty following through with tasks in his home environment. Claimant describes significant interpersonal challenges in his personal and prior work environments as a result of anxiety and bipolar symptoms. His ability to interact with co-workers and the public is likely moderately impaired. Due to anxiety and bipolar symptoms and tendency to isolate himself from others, his ability to maintain regular attendance in the workplace is moderately impaired. His ability to complete a normal work day or work week without interruption from anxiety and bipolar symptoms is likely moderately impaired. His ability to deal with the usual stress encountered in the workplace is markedly impaired if it involves persistent activity, complex task, task pressure, interacting with other individuals. He appears to have some potential physical limitations that would better be assessed by a medical provider.

The ALJ rejected Dr. Metoyer's assessment of a marked limitation in handling the usual stress of the workplace, stating that "it overestimates the level of impairment in this area, given the longitudinal medical record and is not based on any objective medical evidence of record." The ALJ offered no further explanation and provided no supporting citations for these assertions. This simply is not a meaningful evaluation of Dr. Metoyer's opinion and, consequently, prevents this Court from conducting a meaningful review of the ALJ's decision in this regard. If the ALJ believes the level of impairment is overestimated, the ALJ must provide further explanation and citation to record evidence. Likewise, if the ALJ believes the limitation is at odds with the longitudinal record, the ALJ must cite to evidence in the record to support this conclusion.

On remand, the ALJ must avoid making bare conclusory statements and must support her conclusions regarding supportability and consistency with specific explanation and citation to record evidence.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

5.  <u>Dr. Stephen Rubin</u>

Dr. Rubin reviewed the medical evidence of record and provided testimony at the administrative hearing. He opined Plaintiff met the criteria for Listings 12.04 and 12.06 from the alleged onset date to the then-present.[129] The ALJ rejected that opinion, however, stating that the "medical evidence shows only sporadic mental health problems without drug and alcohol use, as most treatment indicates that drugs and alcohol abuse is the primary issue."[130] The ALJ did not provide further discussion about Plaintiff's mental health treatment but additionally noted that Plaintiff "had an excellent work history for many years prior to his alleged onset date with no precipitating reason except drug and alcohol use."[131] Again, the ALJ failed to cite to the record when discussing Dr. Rubin's opinion. Because the matter must be remanded in any case, the ALJ on remand is encouraged to provide a more robust discussion regarding Dr. Rubin's opinion, including citation to specific evidence in the record.

**D.   RFC & Step Five: The ALJ must reevaluate.**

Plaintiff argues the ALJ failed to properly include all his limitations in the RFC and presented an incomplete hypothetical to the vocational expert. Having already determined remand is required, the Court need not address Plaintiff's

---

[129] AR 60-63.

[130] AR 27.

[131] AR 27.

1

2

arguments. On remand, the ALJ shall conduct anew the disability evaluation,

beginning at step two.

3

**E.    Remand for Further Proceedings**

4

5

Plaintiff submits a remand for payment of benefits is warranted. The

6

decision whether to remand a case for additional evidence, or simply to award

benefits, is within the Court's discretion.[132] Remand for further proceedings is the

7

usual course, absent clear evidence from the record that a claimant is entitled to

8

9

benefits.[133] For instance, where "there are outstanding issues that must be resolved

before a determination can be made, or if further administrative proceedings would

10

be useful, a remand is necessary."[134] Here, the record does not clearly establish

11

disability and further administrative proceedings are useful as the ALJ must

12

consider evidence of Plaintiff's bipolar symptoms and whether they have an impact

13

on the disability analysis.

14

On remand, the ALJ must reevaluate the sequential disability analysis

15

beginning at step two. With respect to the medical opinion evidence, the ALJ is to

16

17

18

[132] *See Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987) (citing *Stone v.*

*Heckler*, 761 F.2d 530 (9th Cir. 1985)).

19

[133] *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017); *Benecke v. Barnhart*, 379

20

21

F.3d 587, 595 (9th Cir. 2004) ("[T]he proper course, except in rare circumstances, is

to remand to the agency for additional investigation or explanation.").

22

[134] *Leon*, 880 F.3d at 1047.

23

be mindful that she must meaningfully articulate the supportability and consistency of each medical opinion. The ALJ shall further develop the record if she deems it necessary and shall, if necessary, call a medical expert regarding Plaintiff's diagnosis of bipolar disorder.

## V.    Conclusion

Accordingly, **IT IS HEREBY ORDERED**:

1.    The case caption is **AMENDED** consistent with footnote 2.

2.    Plaintiff's Motion for Summary Judgment, **ECF No. 17**, is **GRANTED**.

3.    The Commissioner's Motion for Summary Judgment, **ECF No. 18**, is **DENIED**.

4.    The Clerk's Office shall enter **JUDGMENT** in favor of Plaintiff REVERSING and REMANDING the matter to the Commissioner of Social Security for further proceedings consistent with this recommendation pursuant to sentence four of 42 U.S.C. § 405(g).

5.    The case shall be **CLOSED**.

**IT IS SO ORDERED.**  The Clerk's Office is directed to file this Order and provide copies to all counsel.

**DATED** this 29th day of July 2021.

_____s/Edward F. Shea_____
EDWARD F. SHEA
Senior United States District Judge